We'll turn to our day calendar, and the first case is Iqbal v. Teva Pharmaceuticals. Thank you. Good morning, panel. Good morning. My name is Adam Peska, and I represent the appellant, Muhammad Zafar Iqbal. This case is an appeal on a motion for summary judgment that was granted. The argument on appeal is that it was granted preemptively, that there were a cornucopia of issues of fact regarding the issue of a four-cause termination. The four-cause termination, even though he was an at-will employee. Do you disagree with that, though, that he was an at-will employee? Do you agree with that? I agree with that, yes. But that doesn't belittle the fact that there still was a contract, and in fact the letter offer that's talked about in the appellant's brief, there's an attachment of additional terms and conditions of his employment even after he's gone, establishing that this is a contract. So therefore, several items in the offer letter, one being the bonus is one major issue here on the appeal, whether or not that was summed up. What right did he have to any payments after he was let go? He had the right to, under the circumstances that- Yeah, what is the authority for his rights? I mean, it seems to me that all those were subsequent to his being let go, and therefore he was gone, notwithstanding the fact that the bonus might have related to what he did earlier or that there was maybe a raise in the process that he could have gotten or something of that sort. Well- You know, a retroactive one. Right. Well, under New York State law, Your Honor, when it's an integral part of the compensation package, he does have a right to it, and it cannot be just denied because he was not there. That's pretty clear under New York State law. The case that's remarkable in this case is the southern district that interpreted New York State law on that issue of bonus. Aren't bonuses-weren't the bonuses here, in effect, discretionary? They could have been held or withheld or not. I mean, he didn't have a right to a bonus. Other people got bonuses afterwards, but they didn't have a right either. They just got bonuses. Well, I believe that it was nondiscretionary. It's part of his offer letter. Now, they could have-he could have gone through the performance review, and they could have said, look, you're not going to get the 20 percent target. We're going to give you 50 percent. We're going to give you 1 percent. We're going to give you no percent. However, he's entitled to the bonus. That's part of his compensation package, and, in fact, it was fully documented. He went through this performance review. He was awarded bonus down to the very dollar. What about the language in the bonus plan that says he has to be an active employee and good standing on the date that the bonuses are paid? That's actually not true. It's not true? It's not in the document? It's a document, but the actual policy itself, the way it's laid out, and Mr. Iqbal puts this in his affidavit, it's actually supported by documents, their own documents. There was a subsequent memo on the issue of severance and bonus, and it says you only have to be there until mid-year. So there actually is documentary evidence showing that he didn't even have to be an employee in good standing at the end of the planned year. What's that evidence? 448, I believe, Judge A. 448. It's the severance policy. It talks about it. He puts it in his affidavit. It's not even disputed. Thank you. But these are for bonuses that are already awarded, aren't they? No, Your Honor. Actually, what's interesting in this, if you look at, go midway down, it talks about short-term incentive bonus and bonuses. Where are you on the page? Midway. 448, where are you on the page? The 1, 2, 3, 4, 5, the fifth paragraph down, Your Honor. And what's interesting in that, if I may, what's interesting in that paragraph, it talks about if you make it through the mid-year, this is interesting, and this is something that Mr. Eichfeld talked about. If you make it through the mid-year, you're actually given 100% of the target bonus, the 20%. So it's really showing that this really is part of, this is an integral part of the compensation. Even without a performance review, you're going to get your bonus 100% prorated, as long as you made it through the mid-year. So that's inconsistent. It's just not the way the policy is laid out. So I would say under Arden, the southern district interpreting New York law on the issue of bonus, that that is an integral part of his compensation. He's entitled to be paid for it. What else do you want to say? Now, as far as all the other issues, Your Honor, in all the other issues of- Did you ask about the pension? What's it called? Severance. No, the- Stock options? Stock options. Yes. Stock options. The plan seems to say that he would only have vested, I think it was 25%, as of March of the year he was terminated, and he was discharged before then. So what's your response to that? It's just false. What's false about it? The falsity about it is these were options that were rewarded back in 2010 and going forward. These were fully vested options. In fact, if you look at the statement, the USB statement, it actually talks about there was rollover stocks that were actually awarded. It wasn't even stock options. He just lost all his stocks, stock options, everything. It was just gone overnight. He had exorbitant options? No, they were basically dividends that became stock awards. These were stock awards, stock options that just vanished overnight, $111,000. What about the vesting provision? They have a timeline for vesting. Right. It seemed to be his timeline was March of the year in which he was terminated for 25%. That's wrong. Is that what you're saying? Yes, it's wrong, Your Honor. If you look at the USB statement, it actually breaks it down. I'm getting a yellow light here. It's just a yellow light. You have two more minutes. Okay. Where's the statement you just mentioned? I think it's 458, Your Honor, I believe. If I may, it talks about actionable value and estimated value. Estimated values are the stocks that have not vested. The actionable value is something he can exercise as options. It's plain English. He could exercise those options. He lost it all overnight for cause under very, very spurious grounds. They basically use an OBI report, a report that is laden with hearsay, double hearsay. It's obviously not a biased. It's a very biased report. It's by Teva. They engage in all-out character assassination. It's really pretty shocking what they did to this guy. I mean, they sort of backpedal in their argument at the lower court, and they say he violated core reasons, and the core reasons being that he used too many e-mails, personal e-mails. It wasn't provided in the motion. You don't really know the content or anything. Sorry, I'm having a little trouble appreciating your argument. He was a poor dupe, and he was totally innocent. There was a policy that prohibited him from outside employment if there was a potential of conflict of interest. If there was a potential, Your Honor, yes. And there was here. I mean, he was working with both companies to try and benefit his outside employment. All right, so I think it's arguable. I think the way that they define conflict of interest talks about best interest of Teva. I think he was working for the best interest of Teva. But if you want to say, if you want to argue that there is a conflict. I'm not going to argue anything. I'm just looking at the facts of the case. All right, well, I would say that that's still a fact issue, whether or not. The next step is whether management actually knew of the conflict because they maintained that. It has to be approved in writing if there's a conflict, doesn't it? I'm sorry? The policy doesn't have to be approved in writing if there's a conflict? I don't know if it has to be approved. It has to be disclosed. In writing. In writing. In writing, correct. In this case, he's claiming that this other gentleman who he had talked to about it, that was the disclosure. No, it was his supervisor. Whatever. Well, not whatever, Your Honor, because the supervisor is the person he's supposed to disclose the conflict to. So it was his supervisor that approached him and initiated it. And, in fact, it was his supervisor that signed the agreement that engaged Sufferin Pharmacy. So his supervisor knew. There's no question about it. His supervisor knew. And, in fact, the record is pretty clear from the e-mails that within weeks. Are you saying that's enough? Well, I'm not saying it's nothing. I'm saying that's still a jury question. It's a fact question. Whether or not that was sufficient to cause, that that was sufficient to terminate someone who is a 19-year employee for cause. That's a fact question. For cause is inherently factual. You have a minute for rebuttal. Why don't we hear from. . . Okay. Thank you, Your Honors. I appreciate it. Mr. Kushner. Good morning, Your Honors. Why don't you start with a bonus? Absolutely, Your Honors. With regard to a bonus payment, Mr. Iqbal, as you heard, relies on a letter that he received in 2012 after he was promoted. The only thing that that offer letter says regarding a bonus is that Mr. Iqbal. . . What is the document you're talking about? The document is A-124. A-124? Yes. One second. Yes. The only thing that that letter says regarding a bonus is that Mr. Iqbal would continue to be eligible to participate in TEVA's bonus program, subject to the terms and conditions in the 2013 bonus program. That's all it says about a bonus. There's no promise. What about what your adversary pointed to, page 448? What about that? Page 448 is part of the severance policy. The specific provision that he pointed to doesn't apply here. This refers to an employee. . . So the bonus that I issued here relates to 2015. Mr. Iqbal was terminated in 2016. This provision applies to employees who are terminated halfway through the year. So if he had been terminated halfway through 2015, that's when this provision would apply. And I would also point out that this provision only states that if their termination occurs after July 1st, they will be eligible for a prorated bonus. It doesn't say that they're guaranteed a bonus. So he was terminated how far through the year? February 26th, 2016. But the bonus is related to 2015. The bonus policy to which the . . . You're saying that what's on 448 simply has no application to the year in which he was terminated, to the bonus that he's talking about? That's correct, Your Honor. The bonus policy . . . How do we verify that? How do we verify that it has no application to the bonus that he's talking about? Well, again, this is the severance policy, and it relates to employees who are terminated, and it says an employee is not eligible for the annual incentive bonus if employment terminates with severance on or before June 30th of the planned year. So, and I apologize, this is the first I've heard of this argument relating to this document, but the planned year for the bonus is the 2015 planned year. Was this argument raised in the district court? No, Your Honor. The bonus policy states that TEVA retains discretion with regard to paying bonuses. It states, quote, Eligibility to participate in the plan does not guarantee a bonus award. So it's a discretionary bonus policy for all employees, and Mr. Iqbal's contention that the policy somehow contractually obligates TEVA to pay him a bonus has no basis. Also, as Your Honor pointed out, the bonus policy explicitly and unambiguously states that an employee must be employed with TEVA on the date when bonuses are paid. It's undisputed that Mr. Iqbal was not employed with TEVA when bonuses were paid in 2016, so he was not eligible for a bonus. With regard to Mr. Iqbal's claim for a retroactive pay increase, pay increases at TEVA are made in March of each year, so it's not in line with the calendar year. It's more in line with the fiscal year for budgetary and other reasons. Again, Mr. Iqbal's employment ended in February before any pay increases were given. His theory is that, one, had he remained employed, TEVA would have given him a pay increase, and that, two, he's somehow entitled to a pay increase or a check for a retroactive pay increase to January 1st, even though he didn't receive a pay increase on January 1st or on any other date in 2016 before his employment ended. As with his other assertions, Mr. Iqbal doesn't identify a contract that would provide for such a payment. His only evidence to support this is an affidavit that he submitted in opposition to TEVA's summary judgment motion in which he alleged that in a previous year he received a pay increase and he also received a separate check for a retroactive pay increase. We dispute that factually, but it doesn't matter for purposes of this case because, again, it's a breach of contract case. So even if it were true that he had received that payment some earlier year, it doesn't establish a contract entitling him to that payment. Can I ask you about the basis for his termination, this issue of whether he had disclosed his interest in Suffern because Suffern was a supplier to TEVA of those branded prescriptions, right? That's right, Your Honor. And it seems like it's a disputed question of fact about whether he fully disclosed that. I know there's evidence that he disclosed that to Tony Tong, his direct supervisor, but how do you explain this e-mail at 424A of the appendix, this Janet Zblekis e-mail where she said everybody should put a stop to this because there's a huge conflict of interest in Iqbal through Suffern supplying these drugs to us, and she copies Tony Tong and a bunch of other people who work for TEVA. How do you explain that? And that was in June of 2015. How do you explain this theory that they fired him when they found out that he was part owner of Suffern in February of the following year? Your Honor, Mr. Tong wasn't deposed in this case, so the undisputed evidence is Mr. Iqbal's assertion that he told Tony Tong. It's irrelevant because he doesn't dispute that he did not follow the conflicts of interest policy. He didn't disclose it in writing. He didn't disclose it to the legal department. He didn't disclose it to HR, to compliance. Those facts are undisputed. So whether his immediate supervisor knew about it or not. That's not what I'm asking you about. It's an e-mail from Janet Zblekis. You know what I'm talking about. It's no surprise to you, right? It's A424. I'm sure you've seen this before. Yes.  His employment at Teva is discussed. Should I contact legal or R&D compliance? I mean, that sounds like it's not just Tony Tong who knows about this, but it was a corporate issue, right? That's right, Your Honor, but this is at the Teva Engage Suffern Pharmacy, I believe, in February or March of 2015.  And after it was discovered, these are the conversations that occurred. And they said, hey, what's going on here? And it made its way through the structure, and that's when they said, you need to stop this right now. There's a conflict of interest that wasn't disclosed. And when did Mr. Michalik get involved in doing the investigation? Mr. Michalik got involved shortly after this. I don't know the specific date, but it was summer of 2015. And his investigation occurred from the summer and ended shortly before Mr. Iqbal's termination in February. Ultimately, though, Your Honor, the facts underlying Mr. Iqbal's termination have very little bearing on this case because there was no contract, and there's no contract guaranteeing Mr. Iqbal the payments he seeks in this case. The only real relevance of the four calls issue is to the stock options, and that's because there's a provision that says if an employee is not terminated for calls, the stock options expire at the latest 90 days after termination. If they're terminated for calls, they expire immediately upon termination. And these are the vested stock options. Can you explain the document that showed all the stock interests that he had that your opponent just pointed to? Your Honor, that's a UBS statement from UBS as a third-party administrator. The document that governed the stock options is TEVA's 2010 long-term equity-based incentive plan, and the incentive plan is what governs the stock options here. Why would he have a statement like this from UBS if he didn't have a vested interest in those stocks? Your Honor, even if he had a vested interest under the incentive plan, they all vested and unvested options expired at the latest 90 days after his termination, and it's undisputed that he didn't even attempt to exercise his options. So do you rule then that he had vested stock options or stock interests at the time he was terminated? Yes. You dispute that? No, I'm sorry. We don't dispute that. I thought you said in your brief that only 25 percent vested a month after he was terminated. That's correct, Your Honor. So this has been sort of a moving target. Before the district court, Mr. Iqbal focused on his stock and claimed that he didn't have access to his stock. During summary judgment, in response to our summary judgment motion, he changed and said that it was stock options, but he was referring to the stock options that Mr. Tong had told him he was awarded in 2015. We don't dispute that there were other earlier stock options, at least according to that UBS statement, which hasn't been authenticated. It appears that there were vested stock options, but it doesn't matter because they expired 90 days after Mr. Iqbal's termination. Thank you. So with regard to the severance policy, again, he only relies upon TEVA's company-wide discretionary severance policy. There's no contract. So we would urge the court to affirm the district court's decision because Mr. Iqbal cannot identify a contract. Thank you, Your Honor. Mr. Pesky, you have a minute? Yes, Your Honor. I just want to clarify. I'm just going to read from my reply brief at the lower court. Counsel indicated this is the first time he's heard of this argument with respect to the judge's issue with the severance and the advance bonus. I'm going to read from my reply brief. The plaintiff explains the following, and I quote, this is a quote from my client's affidavit. TEVA's argument that I was not eligible to earn bonus, he made the same argument at the lower court. He made the same exact argument in the papers. TEVA's argument that I was not eligible to earn bonus because employment was terminated before June 30th, 2015 plan year, Memo of Law, page 18, is inapplicable because I made it through the entire plan year of 2015. I was terminated February 2016. However, my bonus that is currently owed relates to 2015 plan year, which is based upon team performance. Thank you, Judge. Thank you both. We'll reserve decision.